```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

--------------------------------------------)
NEXTEL COMMUNICATIONS OF THE MID-ATLANTIC,  )
INC., d/b/a Nextel Communications,          )
          Plaintiff                         ) CIVIL ACTION NO.
                                            ) 00-11417-DPW
               v.                           )
                                            )
THE TOWN OF HANSON, THE TOWN OF HANSON      )
ZONING BOARD OF APPEALS, and GAYTHA WALLACE,)
DAVID NAGLE and STEVEN De DOMINICI, in their)
capacities as Members of the Town of Hanson )
Zoning Board of Appeals, and THE STATE      )
BUILDING CODE APPEALS BOARD,                )
          Defendants;                       )
                                            )
STEVEN DEFRANCESCO and SUSAN DEFRANCESCO,   )
          Putative Intervenors.             )
--------------------------------------------)

--------------------------------------------)
NEXTEL COMMUNICATIONS OF THE MID-ATLANTIC,  )
INC., d/b/a Nextel Communications,          )
          Plaintiff                         ) CIVIL ACTION NO.
                                            ) 03-12563-DPW
               v.                           )
                                            )
THE TOWN OF HANSON, MASSACHUSETTS, and THE  )
MASSACHUSETTS STATE BOARD OF BUILDING       )
REGULATIONS AND STANDARDS,                  )
          Defendants;                       )
                                            )
STEVEN DEFRANCESCO and SUSAN DEFRANCESCO,   )
          Putative Intervenors.             )
--------------------------------------------)
```

MEMORANDUM AND ORDER
March 26, 2004

At issue in these two closely related actions are the scope

and enforceability of an April 19, 2001 consent order issued by

this court in the first action, directing the Town of Hanson, its

-1-

Zoning Board of Appeals ("ZBA"), and the ZBA's members (collectively, "the Town" or "Hanson") to issue a special zoning permit for Nextel's proposed wireless telecommunications tower. The Town issued the <u>special</u> permit, but the Town's Building Inspector thereafter denied Nextel's application for a <u>building</u> permit, and the Massachusetts Building Code Appeals Board ("State Board") has upheld the Building Inspector's decision.

In the second action, Nextel seeks to establish that the Town and the State Board's denial of the building permit violated the April 19, 2001 order, and that even if the denial did not violate that order, it violated the Telecommunications Act of 1996, which requires denials of authority to build or modify wireless facilities to be supported by substantial evidence in a written record.

Steven and Susan DeFrancesco, abutters to the proposed facility, move in both actions to intervene on behalf of defendants.[1]

## I. BACKGROUND

Nextel's claims originate in a lawsuit originally filed in this court on July 19, 2000 (Case No. 00-CV-11417-DPW, "the prior action"). As discussed in greater detail below, the prior action alleged that the Town of Hanson had violated the

---

[1]Originally, Marston Realty Trust and Hirschfeld Communications LLC also sought to intervene. By letter of January 13, 2004, they have withdrawn their motions.

Telecommunications Act of 1996 ("TCA"), 47 U.S.C. §§ 332
(c)(7)(B)(i) & (iii), by denying Nextel's application to replace
an existing radio tower with a newer facility.  The background
facts set forth below are derived from the record in the prior
case and the procedural paths the controversy has taken.

## A.    The Parties

Nextel Communications is a Delaware corporation with a
regional office in Lexington, Massachusetts.  Nextel is licensed
by the Federal Communications Commission to provide "personal
wireless services" in Massachusetts.

The Town of Hanson is a municipal corporation within the
Commonwealth of Massachusetts.  The ZBA is a zoning board of
appeals under Mass. Gen. Laws ch. 40A, § 12.  Individual named
defendants are or were members of the ZBA.

The Massachusetts State Board of Building Regulations and
Standards ("State Board") is an instrumentality of the
Commonwealth of Massachusetts that serves, inter alia, to render
interpretations of the Massachusetts Building Code.  See
generally Mass. Gen. Laws ch. 143, §§ 93-95.  In its role as an
appellate body reviewing decisions of building inspectors under
the Building Code, it is also known as the Building Code Appeals
Board.  For all purposes relevant here, the Building Code Appeals
Board and the State Board of Building Regulations and Standards

are the same body.[2]  See id. § 100.

The putative intervenors, Steven and Susan DeFrancesco, reside at 123 Liberty Street in Hanson.  Their property abuts the 141R Liberty Street site of the proposed Nextel tower.

**B.  Factual and Procedural History**

Much of the underlying history derived from the prior action need only be recited briefly here.  In 1999, Nextel found a significant coverage gap in its network, comprising most of the Town of Hanson.  Nextel then began looking for locations for a wireless communications facility ("WCF") within the Town that would rectify this gap.

Nextel identified seventeen possible sites in Hanson as candidates for the siting of a WCF.  Five of these candidate sites were located within the Commercial-Industrial district as defined by the Town's zoning by-laws.  Nextel concentrated its efforts, at least initially, on developing one of those five sites in order to conform to the requirements of the zoning by-law that regulates the installation of WCFs within the town.

Sections VII.K.4 and K.6 of the by-laws extensively regulate the installation of WCFs within the Town, including permitting, zoning, dimensional and setback requirements.  For example, they provide that WCFs may not exceed the height limits of the zoning

---

[2]For reasons not important here, the two actions here differ in which name they list for the state defendant.  Although it appears that, technically, the proper defendant is the Building Code Appeals Board, I treat both as referring to the same body, and in no way differentiate the two.

area in which they are located by more than ten feet, with the exception of WCFs in the Commercial-Industrial District, which may be up to 150 feet high.

From computer tests, Nextel determined that none of the sites in the Commercial-Industrial district, which was located in the southwestern portion of Hanson, would bridge its coverage gap, which was mainly in the northeastern portion of the town. Nextel then considered locations outside the Commercial-Industrial district.  In particular, Nextel investigated the possibility of using an existing 117 foot tower located on a six acre parcel at 141R Liberty Street near the center of Hanson. However, the existing tower was not tall enough to enable the necessary coverage.  Based on further computer tests, Nextel concluded that placing a 130 foot facility at the Liberty Street site would satisfy Nextel's coverage requirements, and offered several other advantages.

On February 15, 2000 Nextel applied to the ZBA for a special permit to replace the existing Liberty Street tower.[3]  The special permit application explained Nextel's coverage gap,

_____

[3]Under Massachusetts law, local zoning by-laws may "provide for specific types of uses which shall only be permitted in specified districts upon the issuance of a special permit." Mass. Gen. Laws ch. 40A, § 9.  In other words, a by-law may place additional requirements on certain uses.  The special permit should not be confused with the variance, which may be issued where "literal enforcement of the provisions of [a zoning] ordinance or by-law would involve substantial hardship, financial or otherwise."  Id. § 10.  In short, a variance is an exemption from zoning requirements normally applicable to the parcel, whereas a special permit relates to extra conditions beyond the zoning requirements normally applicable to the parcel.

recounted the company's unsuccessful efforts to find a viable location in the designated Commercial-Industrial district, and described the design of the proposed tower.

On April 5, 2000 the ZBA held a public hearing on Nextel's application, but did not reach a final decision. The ZBA held additional hearings on May 11 and June 1, 2000. During these hearings, Nextel provided additional evidence, including signal propagation maps and testimony from a radio frequency engineer, describing how no other locations in Hanson would correct Nextel's coverage gap. The ZBA also received evidence from a firm, Merrill Associates, retained by the Board to evaluate the Nextel proposal's compliance with the by-laws. Merrill Associates recommended that the ZBA receive clarification of several design features of the proposed tower, including proper structural support and structural integrity, but did not recommend against approving the Nextel proposal.

The ZBA also received comments from neighbors and abutters, concerning whether the existing tower had been approved by the Board, whether the Nextel design was safe, and whether the Nextel tower would cause interference with television and satellite antennas. At the June 1, 2000 hearing, ZBA members raised the concern that the existing tower had been "abandoned" and that, as a result, a provision of the by-laws for replacing an existing tower would not apply. Nextel contended that this interpretation of the by-law was incorrect because the tower itself had not been

-6-

abandoned, even if it was no longer being used.  At the conclusion of the June 1, 2000 hearing, the ZBA denied Nextel's application by unanimous vote.

On June 14, 2000 the ZBA issued its written decision.  As reasons for the denial, the ZBA stated that Nextel's proposed tower would be "substantially more detrimental" to the area than the existing tower and would have unspecified "adverse effects" on the Town.  The ZBA also stated that because the existing tower had not been used for over a period of two years, Nextel was not able to take advantage of the by-law permitting modification of existing towers outside of the Commercial-Industrial district.

On July 19, 2000 Nextel filed the prior action against the Town of Hanson, the ZBA, and individually named ZBA members. Count I of the complaint alleged that the defendants violated 47 U.S.C. § 332 (c)(7)(B)(iii) by failing to base the denial of the permit on "substantial evidence contained in a written record," and Count II alleged that they had violated § 332 (c)(7)(B)(i)(II) by effectively prohibiting wireless service in the Town.  Count III alleged a deprivation of rights under 42 U.S.C. § 1983; Count IV alleged violation of Massachusetts state law.  Counts I, II, and IV requested a writ of mandamus or injunction "directing the Town to grant the special permit and all other permits and approvals necessary for tower construction to proceed."

In April 2001, before this court had reached a decision on

-7-

the merits, Nextel and the Town agreed to settle the dispute. The parties prepared a proposed consent judgment, which I approved in the April 19, 2001 order ("Consent Decree"). The Consent Decree granted judgment to Nextel on Count I of its complaint, and dismissed all the other claims with prejudice.

Despite receiving judgment in its favor, Nextel did not work further on developing the site until December 2002. Nextel resumed the process of developing the site. In February 2002 the Town informed Nextel that the Liberty Street tower could not be built without "site plan review" as defined by the zoning by-law. Nextel responded that the Consent Decree directed that the WCF could be built in accordance with the plans originally submitted to the ZBA without further approval. The Town subsequently dropped its demand that Nextel acquire site plan approval.

Nextel then applied for a building permit, but the application was denied. The Town Building Inspector denied the building permit on the grounds that the proposed construction did not meet setback requirements expressed in the Massachusetts Building Code, Mass. Regs. Code tit. 780, § 3109.1. Specifically, the Building Inspector contended that the proposed Liberty Street WCF failed the Building Code's requirement that roof mounted antennas "not be erected nearer to the lot line than the total height of the antenna structure above the roof." Nextel contended that § 3109.1 only applied to antennas for which permits were <u>not</u> required, as opposed to Nextel's proposed tower,

for which permits were necessary.

On April 20, 2003 Nextel filed a motion in the prior action to enforce the consent decree and for contempt. One day later, abutters Steven and Susan DeFrancesco moved to intervene. On June 19, 2003 I entered a Procedural Order reserving all motions until further state administrative proceedings were completed. In order to avoid timeliness disputes regarding review, I ordered the Hanson Building Inspector to redetermine the Building Code issue, and directed Nextel to appeal any adverse decision to the State Board.

On July 8, 2003 the Building Inspector again determined that the WCF would violate the Building Code. On July 17, 2003 Nextel timely appealed to the State Board. Under Mass. Gen. Laws ch. 143, § 100, the Board was required to hold a hearing within thirty days of Nextel's filing, and issue a written decision within thirty days thereafter.[4]

On September 11, 2003, nearly a month late, a hearing was conducted before a three-member panel of the Board. On October 29, 2003, still awaiting a Board ruling, Nextel filed a Second Motion to Enforce Consent Judgment. On November 3, 2003 I denied that motion without prejudice to renew, provided the State Board was joined as a party to the prior action. Meanwhile, on

---

[4]The Building Code, however, expressly provides that failure to conduct the hearing within thirty days, or to render a decision within thirty days, does not affect the validity of the decision. Mass. Regs. Code tit. 780, §§ 122.2.1, 122.4.3.

November 6, 2003 the Board panel met and deliberated on the case, but did not issue a decision.  On November 25, 2003, Nextel moved to join the State Board as a party to the prior action.

On December 1, 2003 I granted Nextel's motion to join the State Board as a defendant, and issued an Order to Show Cause giving the State Board until December 9 to demonstrate why Nextel's Second Motion to Enforce Consent Judgment should not be granted.  On December 3, 2003, some four and one-half months in default of its statutory timeliness obligations, the State Board responded by issuing a written decision stating that the Building Inspector had correctly applied the provisions of Mass. Regs. Code tit. 780, § 3109.

On December 10, 2003 I entered a scheduling order requiring Nextel to file a separate action under 47 U.S.C. § 332(c)(7)(B)(v) to review the State Board's decision under the "substantial evidence" standard.  On December 19, 2003 Nextel filed a complaint commencing the second action, Civil Action No. 03-12563-DPW ("the Building Code action"), alleging three counts: first, that the State Board violated 47 U.S.C. § 332(c)(7)(B)(iii) by denying Nextel's authorization without "substantial evidence"; second, that the State Board's decision was arbitrary and capricious in violation of Massachusetts law; and third, that Nextel was entitled to declaratory and injunctive relief stating that the Massachusetts Building Code is preempted

here by the Consent Decree.[5]  On January 20, 2004 the
DeFrancescos moved to intervene in the Building Code action.

Now before me are (1) the DeFrancescos' motion to intervene
in the prior action, (2) Nextel's motions in the prior action to
enforce the Consent Decree and for contempt, (3) the
DeFrancescos' motion to intervene in the Building Code action,
and (4) Nextel's motion for summary judgment in the Building Code
action.

---

[5]It is worth noting that there is some harmless redundancy
in naming both the Town and the State Board as parties to each
actions.  In the prior action, neither the motion to enforce the
Consent Decree nor the motion for contempt can be granted against
the State Board for the simple reason that, as a non-party, it
was not bound by the Consent Decree.  In the Building Code
action, relief cannot be awarded against the Town because the
Building Inspector's initial decision was superseded completely
by the State Board's decision.  See infra pp. 34-34 & notes 15-
16.  Put differently, the Town (including the ZBA and its
members) is the real party in interest in the prior action, and
the State Board is the real party in interest in the Building
Code action.

## II. THE PRIOR ACTION

### A.    Motion to Intervene

The proposed intervenors, the DeFrancescos, sought first to intervene in the prior action, claiming that they have an interest in whether any building permit may be issued to Nextel. They contend that Nextel's WCF must meet the Building Code's setback requirements for roof-mounted antennal structures, and that it does not do so.  Furthermore, they claim that their interests in the matter cannot adequately be represented by the parties to the underlying action.

Motions to intervene as of right are governed by Rule 24:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: . . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a).  Thus, to intervene as of right under Rule 24(a)(2), a prospective intervenor must meet four conditions: (1) a timely motion, (2) an interest relating to the property or transaction which is the subject of the action, (3) a risk that the action may impair the intervenor's ability to protect its interest, and (4) lack of adequate representation by existing parties.  Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 637 (1st Cir. 1989).

-12-

The second and third elements (interest relating to the subject of the action, and potential of action to impair intervenors' ability to protect their interest) are clear and require little discussion. As neighbors of the 141R Liberty Street site, the DeFrancescos have concerns about the safety of the proposed tower (if it falls, it might land on their property), its aesthetics, and its effect on the value of their own property. Abutter interest in the use of a property is well-settled. See, e.g., Butts v. Zoning Bd. of Appeals, 18 Mass. App. Ct. 249, 253-54 (1984) (abutter has interest in preventing expansion of non-conforming use on abutting property, and in preserving view from own property).[6] Likewise, the action's potential to impair the DeFrancescos' ability to protect their interest is obvious: if this action succeeds, Nextel will have one less obstacle to building the tower, and theoretically might start construction the day judgment is entered.

As explained below, I find that there is a risk that the DeFrancescos' interests would not be adequately represented by the existing parties to the prior action. However, I will deny their motion to intervene in the prior action on the grounds that

_____

[6]The same interest that establishes the DeFrancescos' interest for Rule 24(a) purposes also establishes their standing for Constitutional purposes. In reaching this conclusion, I express no view as to the "as yet unsettled question" of whether intervenors require standing, Manqual v. Rotger-Sabat, 317 F.3d 45, 61 & n.5 (1st Cir. 2003), because in this case, they clearly have established their standing.

it was not timely filed.

1.  Adequacy of representation by existing parties

The DeFrancescos concede that both the State Board (in the Building Code action) and the Town (in both actions) share their interests in denying the permit on the grounds that the proposed WCF would not comply with the Code.  However, the DeFrancescos contend that the Town's advocacy (in the prior action) has not been and will not be vigorous, as demonstrated by its past choice to reach a compromise.

The First Circuit has adopted a three-factor test to assess adequacy of representation:

> (1) Are the interests of a present party in the suit sufficiently similar to that of the absentee such that the legal arguments of the latter will undoubtedly be made by the former; (2) is that present party capable and willing to make such arguments; and (3) if permitted to intervene, would the intervenor add some necessary element to the proceedings which would not be covered by the parties in the suit?

United Nuclear Corp. v. Cannon, 696 F.2d 141, 144 (1st Cir. 1982) (quoting Blake v. Pallan, 554 F.2d 947, 954-55 (9th Cir. 1977)).

If the intervenor has the "same ultimate goal" as an existing party, then there is a presumption of adequacy.  United Nuclear, 696 F.2d at 144.  The strength of this presumption is "ratcheted upward" when the intervenor attempts to enter on the same side as a government agency to defend the agency's decision.  Pub. Serv. Co. of New Hampshire v. Patch, 136 F.3d 197, 207 (1st Cir. 1998).  "[W]hile there are various ways to show that state

representation is not adequate, the burden of overcoming the presumption is upon the would-be intervenor." Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n, 197 F.3d 560, 567 (1st Cir. 1999). This burden is not onerous: the intervenor need only show that "representation may be inadequate, not that it is inadequate." Conservation Law Found. of New England, Inc. v. Mosbacher, 966 F.2d 39, 44 (1st Cir. 1992) (emphases added).

However, the adequacy of representation requirement is "more than a paper tiger" and the intervenor must always provide "some tangible basis" of inadequacy; given the heightened presumption of adequate representation by a governmental party, the intervenor must go further and provide "'a strong affirmative showing.'" Patch, 136 F.3d at 207 (quoting United States v. Hooker Chems. & Plastics, 749 F.2d 968, 985 (2d Cir. 1984)).

The question is whether the various defendants would adequately represent the DeFrancescos' interests in the prior action. While the State Board can be presumed to vigorously defend its interpretation of the Building Code in the Building Code action, Intervenors' interests in the prior action go further. Intervenors seek to argue that the Consent Decree did not include the grant of a building permit, whereas the State Board has little interest in arguing (and, in fact, does not argue) questions concerning the scope of the Consent Decree. I agree with Intervenors that the State Board will not adequately represent their interests in the prior action.

-15-

The adequacy of the Town's representation presents a closer question, since the Town does argue the scope of the Consent Decree.  The DeFrancescos advance three arguments why the Town still does not adequately represent their interests: (1) after the Consent Decree issued, a member of the ZBA stated that she thought Nextel would need to appear before the ZBA again before a special permit could be issued, yet no such appearance occurred; (2) the Town has been aware of an existing alternative structure suitable for Nextel's needs; and (3) the Town, in the Building Code action, apparently concedes that the Consent Decree operated to grant Nextel a special permit.  The DeFrancescos do not explain the relevance of the first two points, but one might take them to mean that the Town has been lax, since the Consent Decree issued, in pursuing what the DeFrancescos believe to be the Town's legitimate options to prevent construction of the WCF.  On the third point, the DeFrancescos appear to argue (unlike the Town) that the Consent Decree did <u>not</u>, without more, grant Nextel a special permit.  Indeed, the Town does so concede.  However, in light of the Consent Decree's plain language that "judgment is hereby entered in favor of the plaintiff . . . and a Special Permit . . . is issued," it is hard to understand how the DeFrancescos can argue otherwise.[7]

_____

[7]In point of fact, they do not; their brief on the merits essentially abandons this argument, and is wholly confined to the Building Code issues.  The DeFrancescos do point out that the Consent Decree does not, by its terms, grant Nextel a <u>building</u>

Nevertheless, applying the First Circuit's adequacy of representation test, see United Nuclear, 696 F.2d at 144, and bearing in mind the low standard requiring the DeFrancescos to show only that "representation may be inadequate, not that it is inadequate," Conservation Law Found., 966 F.2d at 44, I find that, while it is a close question, the Town might not adequately represent the DeFrancescos. To be sure, the "interests of [the] present part[ies] in the suit [are] sufficiently similar to that of the absentee[s] such that the legal arguments of the latter will undoubtedly be made by the former." See United Nuclear, 696 F.2d at 144. Indeed, the test of time has shown this to be so: the DeFrancescos' brief on the merits, to the extent that it addresses issues within the scope of the prior action, argues simply that the Consent Decree did not encompass building permits.[8] Moreover, the Town is "capable and willing" to argue that the Consent Decree did not encompass building permits, and that the Building Inspector's action was proper under the

---

permit, but that point is also made by the Town.

[8]The DeFrancescos do offer additional legal contentions, inartfully placed in what is styled as a "Local Rule 56.1 Concise Statement of Material Facts as to which Genuine Issues Exist." For instance, they argue that, after Nextel's building permit was denied, state law required it to apply for a variance; since it did not, federal jurisdiction is precluded by Nextel's failure to exhaust administrative remedies. However, these points are offered without citations to case law, or argumentation, and I hereby deem them waived. See King v. Town of Hanover, 116 F.3d 965, 970 (1st Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Building Code.

However, if the DeFrancescos were permitted to intervene, they might add a "necessary element to the proceedings which would not be covered by the parties in the suit."  See id.  That element is an uncompromising opposition to construction of any WCF at the Liberty Street site.  There are virtually unlimited ways in which Nextel and the existing parties might compromise in a manner prejudicial to the DeFrancescos' interests.  For instance, the Town might drop opposition to construction of the tower in exchange for some unrelated benefit elsewhere in the Town.[9]  Because the Town settled the prior action, the

---

[9]Presumably the Town would require the State Board's consent to do this, since the State Board has now ruled on the Building Code question.  Unlike the Town of Hanson Zoning By-Laws, for which the Town (through its ZBA) is the final authority, the Massachusetts Building Code is a body of state law that the Building Inspector had an independent duty to enforce.  See generally Mass. Gen. Laws ch. 143, § 3A; Mass. Regs. Code tit. 780, §§ 106.1, 111.1.  While it is undisputed that a Building Inspector's decision on a zoning by-law may be appealed to the ZBA, see McDonald's Corp. v. Town of Seekonk, 12 Mass. App. Ct. 351, 353 (1981); Mass. Gen. Laws ch. 40A, §§ 7-8, it is not clear that the ZBA or any other instrumentality of the Town could have overruled the Building Inspector as to the Building Code .  The only bodies that the Building Code expressly authorizes to overrule a Building Inspector on a Building Code question are (1) the State Board, or (2) a local or regional Building Code board of appeals, which the Town apparently lacks.  See Mass. Gen. Laws ch. 143, § 100 (State Board authorized both to hear appeals under Code, and to variances); Shriners' Hosp. for Crippled Children v. Boston Redevelopment Auth., 4 Mass. App. Ct. 551, 560-61 (1976) (holding that only State Board may grant such variances); Mass. Regs. Code tit. 780, § 122.7.1 (authorizing local or regional board of appeals to hear appeals).  This appears to eliminate the possibility that the Town could compromise the matter adversely to the DeFrancescos in the Building Code action.

-18-

DeFrancescos' fear is not unreasonable.  Cf. Conservation Law Found., 966 F.2d at 44 (where government defendant, in earlier phase of litigation, had "accepted the consent decree which provides for virtually all the relief sought," and in present litigation was silent as to "any intent to defend the [proposed intervenors'] special interests," intervenors were left "with the distinct feeling that the [government was] less than wholeheartedly dedicated to opposing the [plaintiff's] aims").

In short, there is a genuine potential for divergence of interests because, while the Town presently opposes construction of the tower, it might change or soften that position based on its broader geographic and institutional interests.  For these reasons, the First Circuit has hinted in recent cases that abutting landowners should, as a general matter, be permitted to intervene in federal actions brought under the TCA.  See Metheny v. Becker, 352 F.3d 458, 462 (1st Cir. 2003); Brehmer v. Planning Bd., 238 F.3d 117, 119 n. 2 & 122 (1st Cir. 2001).  Here, the DeFrancescos, by their presence, could block a second settlement that would allow the WCF to be built without addressing their concerns.  I therefore find that the DeFrancescos' interests in the prior action might not be adequately represented by existing defendants.

2.  Timeliness

Because Rule 24 "itself sets down no bright line standard for determining what constitutes timeliness," Public Citizen v.

Liggett Group, Inc., 858 F.2d 775, 784 (1st Cir. 1988), the First
Circuit has adopted a four-factor test to determine if a motion
to intervene is timely.  The court must consider:

> [1] the length of time the would-be intervenor knew or
> reasonably should have known that its interest was
> imperilled before it moved to intervene; [2] the
> foreseeable prejudice to the existing parties if
> intervention is granted; [3] the prejudice to the
> would-be intervenor if intervention is denied; and [4]
> exceptional circumstances which may militate against or
> in favor of allowing late intervention.

Navieros Inter-Americanos, S.A. v. M/V Vasilia Exp., 120 F.3d
304, 321-22 (1st Cir. 1997); see also NAACP v. New York, 413 U.S.
345, 364-69 (1973) (reviewing denial of a motion to intervene on
the basis of: (1) how long petitioner knew or should have known
of the suit; (2) promptness with which the petitioner acted once
aware of the suit; (3) unusual circumstances warranting
intervention; and (4) unusual circumstances militating against
intervention).  Because I see no "exceptional circumstances," I
address only the factors of the DeFrancescos' delay, and whether
they would be prejudiced if their motion to intervene in the
prior action is denied.

The DeFrancescos' long delay before moving to intervene in
the prior action weighs heavily against allowing their motion.
Nextel applied to the ZBA for a special permit on February 15,
2000.  The first public hearing on the application was held less
than two months later, on April 5, 2000.  Because the ZBA did not
reach a decision, two more public hearings were held on May 11
and June 1, 2000.  At each hearing, numerous Hanson residents

stated their concerns about Nextel's proposal.  Mr. DeFrancesco apparently attended and spoke at all three public hearings.  It is abundantly clear from the record that as of April 5, 2000, Mr. DeFrancesco knew about Nextel's plans.  Moreover, his repeated presence at the ZBA hearings suggests an ongoing involvement in and awareness of the progress of the application.

Nextel commenced the prior action on July 19, 2000.  Pre-trial proceedings and, as it happened, settlement discussions took place for almost a year.  In April 2001 the parties negotiated and executed an agreement for judgment; I approved that agreement by means of a Consent Decree dated April 19, 2001.  As noted above, the Consent Decree specified that Hanson had violated the TCA by failing to base its denial of the Nextel permit on substantial evidence.

In short, the Town of Hanson and Nextel were in a dispute over the siting of the proposed WCF from February 2000 through

April 2001.  This period is certainly of sufficient duration, and
was marked by significant public debate, so as to have put any
prospective intervenors on notice of the initial proceedings, and
indeed the entirety of the prior action.  See NAACP, 413 U.S. at
365-66 (lapse of four months constitutes untimely delay); United
Nuclear, 696 F.2d at 143 (seven month gap between filing of suit
and motion to intervene permits finding of untimeliness).[10]

To be sure, postjudgment intervention is not necessarily
untimely when intervenors are surprised by a compromise
agreement.  The DeFrancescos probably thought the Town would
vigorously dispute the initial action, not that it would enter

---

[10]In my December 10, 2003 Procedural Order I instructed the
parties to address the issue of whether Massachusetts state court
procedure would have required formal notice of either the zoning
dispute or the Building Code dispute to abutters, and if so, what
relevance that would have in federal court.  Although Nextel
briefed the issue, the DeFrancescos did not.  The short of it is
that the state law of notice, which is purely procedural, has no
prescriptive role in federal court.  Even when a federal court
sits in diversity, it applies federal procedural law.  Gasperini
v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996).  Nothing
in the TCA suggests that a TCA plaintiff must comply with state
notice requirements.
        Only slightly more complex is the question whether a failure
to meet state notice requirements in the state administrative
process could bear upon the propriety of intervention by the un-
notified party.  Since "the length of time the would-be
intervenor knew or reasonably should have known that its interest
was imperilled before it moved to intervene" is a factor in
determining the timeliness of a motion to intervene, Navieros
Inter-Americanos, 120 F.3d at 321, evidence that a proposed
intervenor lacked actual or constructive notice of the risk to
its interest presented by the federal action would be relevant in
evaluating a delay.  But that inquiry must focus on whether the
"the would-be intervenor knew or reasonably should have known" of
the pending federal matter; the fact that it did not receive the
benefits of state law notice formalities in a state
administrative process is of little or no relevance.

into a consent decree.  If so, intervention could be timely if
they moved to intervene once they realized the divergence in
positions:

> [P]ostjudgment intervention is not altogether rare. . .
> . It is now well-established that it is not the simple
> fact of knowing that a litigation exists that triggers
> the obligation to file a timely application for
> intervention.  Rather, the appropriate inquiry is when
> the intervenor became aware that its interest in the
> case would no longer be adequately protected by the
> parties.

Pub. Citizen, 858 F.2d at 785.  But the DeFrancescos did not move
to intervene in the prior action in 2001, when the Consent Decree
was entered, and attempt to challenge it then.  Rather, they
first moved to intervene two years later, on April 21, 2003,
after Nextel moved to enforce the Consent Decree in the prior
action.  I find that this delay was excessive.

Moreover, I do not find that denying the DeFrancescos' late-
filed motion to intervene in the prior action would unfairly
prejudice their ability to protect their interests.  By not
moving to intervene in the prior action until April 2003, they
essentially forfeited their ability to protect any interests that
became manifest before that point.[11]

---

[11]It is worth noting that permitting intervention in the
prior action would theoretically allow the DeFrancescos to
challenge the Consent Decree itself.

-23-

Because I find the DeFrancescos' attempt to intervene in the prior action to be untimely, I will DENY their motion to intervene in the prior action.

**B.    Motion to Enforce Consent Decree**

In support of its motion to enforce the Consent Decree in the prior action, Nextel advances two principal arguments. First, it contends that the state Building Code is preempted by the TCA in this case, both because of the prior finding of a TCA violation and because the Consent Decree encompassed the full spectrum of permits and approvals necessary for the construction of the WCF.  Second, Nextel argues that, even if the Building Code applies, the Town's decision was not supported by substantial evidence, and was in fact arbitrary and capricious.

The Town contends that the Consent Decree did not address the Building Code, and that, whatever the Consent Decree resolved, it required Nextel to comply with all generally applicable laws not expressly within its scope.  On the merits, it defends the Building Inspector and State Board's interpretation of an ambiguous regulation as reasonable and supported by substantial evidence.

1.    <u>Standard of Review</u>

Evaluation of the scope of a consent decree involves a two step process: (1) construction and interpretation of the consent order itself; and (2) a determination whether the challenged

conduct falls with the order's proscription.  See, e.g., Porrata
v. Gonzalez-Rivera, 958 F.2d 6, 8 (1st Cir. 1992); United States
v. Reader's Digest Ass'n, 662 F.2d 955, 960 (3d Cir. 1981).
"[C]onstruing the meaning of a consent order, even an ambiguous
one, is a question of law for the court . . . ."  Reader's
Digest, 662 F.2d at 961.

A consent decree is construed "'basically as a contract.'"
United States v. Charter Int'l Oil Co., 83 F.3d 510, 517 (1st
Cir. 1996) (quoting United States v. ITT Cont'l Baking Co., 420
U.S. 223, 238 (1975)); AMF, Inc. v. Jewett, 711 F.2d 1096, 1101
(1st Cir. 1983) (courts adhere more closely to contract
principles in construing consent decrees entered into by private
parties than in those born out of public law litigation).
Therefore, in construing a consent decree, the court may rely
upon "the usual considerations of contract interpretation" such
as the language of the decree, the circumstances surrounding its
formation, and its purposes, AMF, Inc., 711 F.2d at 1102, as well
as "'any technical meaning words used may have had to the
parties, and any other documents expressly incorporated in the
decree,'" Charter Int'l Oil Co., 83 F.3d at 517 (quoting ITT
Cont'l Baking Co., 420 U.S. at 238).  A court construing a
consent decree may rely upon the intent of the parties at the
time that they negotiated the order to resolve ambiguities in
that order.  See Porrata, 958 F.2d at 8; AMF, 711 F.2d at 1102.

However, if the decree is "too vague to inform the burdened

-25-

party" of what is required and what is forbidden, then it will
not be enforced.  See AMF, 711 F.2d at 1101.  Of course, the mere
fact that a dispute arises over the meaning of its terms does not
mean that a consent decree is unenforceably vague.  Id. at 1102.

    2.   <u>Analysis</u>

        a.   <u>Preemption</u>

    Nextel presents two versions of its preemption argument.
First, Nextel contends that the state Building Code is preempted
because once a court has found a TCA violation, then all further
state law is preempted, regardless of the exact phrasing of the
judgment entered.  Second, more modestly, Nextel contends that
the Consent Decree in the prior action embraced building permits.

        i.   Preemption of the State Building Code

    Nextel contends that, once the TCA has been violated, it
preempts the Building code, and cites <u>Brehmer</u> for the proposition
that, once a violation of the TCA has been found, municipalities
may not rely on state law to prohibit or impede construction of
the replacement facility.

    I do not agree that the state Building Code was preempted
here.  The First Circuit's decision in <u>Brehmer</u> is
distinguishable.  There, the court considered a challenge by town
residents to a negotiated consent decree which had mandated the
issuance of a special permit to a wireless carrier.  See 238 F.3d
at 120.  The plaintiffs contended that the town zoning board had
exceeded its authority when it entered into the consent decree

and agreed to issue the special permit for construction of a WCF without conducting further hearings on the matter.  See id.  The court rejected the plaintiffs' argument, holding that the TCA preempts state law that might conflict with it.  See id. at 121.

Brehmer turned on the fact that the plaintiffs' requested relief was simply the opportunity to conduct public hearings on the issuance of the special permit that was the subject of the court order.  The First Circuit explained that "a remand for further hearings, which appellants claim Massachusetts law requires, would accomplish nothing more than opening up for public debate the issue of whether the Planning Board should comply with the terms of the settlement agreement it had entered into (not to mention the consent decree embodying that settlement)."  Id. at 121-22.  In other words, the consent decree in Brehmer effectively replaced the state procedure for the issuance of special zoning permits with one negotiated by the parties and approved by the court.

Here the situation is somewhat different, because the argument concerns the applicability of the state Building Code, which was not expressly addressed in the Consent Decree.  As a consequence, the preemptive effect of the TCA, as made manifest in the April 2001 Consent Decree, is absent.  Moreover, while the TCA does effectively limit the ability of state and local authorities to regulate the installation of wireless facilities, localities nevertheless retain some measure of control.  Thus,

the TCA provides:

> Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with § 254 of this section, requirements necessary to preserve and advance universal service, <u>protect the public safety and welfare</u>, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

47 U.S.C. § 253(b) (emphasis added).  In this case, the state Building Code may properly be understood, at least in part, as a measure designed to "protect public safety and welfare."  Nextel cites no cases, and I find none, stating that the TCA preempts neutrally applied building code requirements.  <u>Cf.</u> <u>Qwest Corp. v. City of Santa Fe</u>, 224 F. Supp. 2d 1305, 1317 (D.N.M. 2002) (building codes covering telecommunications facilities on public rights-of-way are not preempted by TCA § 253).

In other words, the state Building Code has a place within the TCA scheme so long as its implementation does not amount to effective prohibition of telecommunications service or otherwise violate the Act.  In this case, notwithstanding the judgment against the Town, I conclude that the TCA does not preempt the state Building Code.

ii.  Scope of the Consent Decree

Having concluded that the Building Code was not preempted by the mere fact that the Town had been found to have violated the TCA, I now must address whether it was preempted by the specific Consent Decree entered in the prior action.  The Consent Decree did not mention a building permit, and I find that it did not

-28-

encompass the issuance of one.

There is no genuine dispute that the Consent Decree directs the issuance of the <u>special</u> permit.  Instead, the disagreement focuses on whether the Consent Decree reached beyond the issuance of the special permit to other aspects of the permitting process. The Town contends that the plain language of the Consent Decree refers only to the issuance of the special permit, whereas Nextel contends that the Consent Decree mandates the issuance of all permits and approvals necessary for construction.

I begin my analysis within the four corners of the document. The Consent Decree provides, at its heart, that judgment is entered as to Count I of Nextel's Complaint, such that "a special permit pursuant to the Town of Hanson Zoning By-Laws Section VII.K.18 is issued to Nextel to replace an existing 117-foot tall antenna located at 141R Liberty Street . . . with a 130-foot tall wireless services facility . . ."  <u>See</u> Consent Decree at 1.  The only permit mentioned is a special permit, pursuant to the Town of Hanson Zoning By-Laws; no mention is made of a building permit, the Building Code, or any other provision of law.  In

sum, the Consent Decree does not even imply that any other necessary permits must be issued to Nextel.

It is true that the Consent Decree includes other conditions that pertain not to zoning concerns, but rather to other requirements for construction of Nextel's tower. See Consent Decree ¶¶ 1-5. For example, the Consent Decree provides that "[p]rior to commencement of construction" Nextel must provide a bond of $25,000. Id. ¶ 1. It then states that "[c]onstruction of the personal wireless facility shall be performed in accordance with the application submitted by Nextel and the plans prepared by Turning Mill Consultants in support of Nextel's application for a special permit." Id. ¶ 2. Next, it places yet another condition on the construction: before starting any work authorized by the special permit, Nextel shall submit "detailed drawings and calculations, stamped by a structural engineer." Id. ¶ 3. These drawings and calculations, it continues, must attest to the structural integrity of the new tower and its support guys, and provide a structural examination of the existing building. Id. Later paragraphs place other conditions on Nextel's construction and design, requiring co-location and clean-up of the site. Id. ¶¶ 4-5.

However, I do not interpret these conditions as an exhaustive list containing all the building or structural conditions that the Town reserved its right to enforce. First, in the context of this litigation, I find it at least equally

plausible that the conditions were negotiated solely with a
zoning permit in mind.  The Town may have convinced Nextel that
the Town would be able to convince this court that, even if the
Town were found to have violated the TCA and ordered to issue a
special permit, it should still be able to insist upon conditions
of this nature.  Or the Town may have insisted upon the
additional conditions simply as a quid pro quo for settling the
case rather than litigating to the bitter end.

     Second, if viewed in the light of the Massachusetts law
governing special permits, the conditions would be interpreted as
zoning conditions.  It is important to first understand that, in
Massachusetts, a special permit (a creature of zoning law) is
quite distinct from a building permit:

> [The] permit to build is entirely different in kind
> from the special permit. One is issued by the building
> inspector and the other is authorized by decision of
> the board only after many formalities have been
> complied with.  Under the ordinance the board may
> impose appropriate conditions and safeguards in
> granting special permits.

LaCharite v. Bd. of Appeals, 327 Mass. 417, 422 (1951).  The
"appropriate conditions and safeguards" in a special permit are,
like the permit itself, part of the zoning law.  "Conditions of a
variance or a special permit are subsumed in the provisions of
[Mass. Gen. Laws ch.] 40A and ordinances or by-laws under which
they are promulgated; they are part of the zoning law to be
enforced."  Wyman v. Zoning Bd. of Appeals, 47 Mass. App. Ct.
635, 637 (1999), rev. denied, 430 Mass. 1112 (1999).  While one

might theoretically argue that the five enumerated conditions are not conditions <u>of</u> the special permit, but just conditions included in the Consent Decree <u>alongside</u> issuance of the special permit, I find that the language providing that "a special permit pursuant to the Town of Hanson Zoning By-Laws Section VII.K.18 is issued to Nextel . . . with the following conditions" supports, rather than weakens, the inference that the conditions are simply part of the special permit.[12]

Nextel's best response is that such a reading strips it of the relief it won.  By settling the case, Hanson agreed that it had violated the TCA by failing to base its denial of Nextel's application on substantial evidence.  In exchange for Hanson's admission, Nextel agreed to dismiss Counts II-IV of its original complaint with prejudice.  On these facts alone, it may appear unlikely that Nextel intended to trade away the right to pursue its other claims against the Town if the sole effect of the agreement was to enable Nextel to subject itself to further regulatory action by the Town.  Indeed, Count I of Nextel's original complaint (to which the Town admitted liability) prayed

---

[12]Indeed, even if the Town <u>wanted</u> to waive application of the Building Code, it is not clear whether, under Massachusetts law, it would have had the authority to do so.  <u>See supra</u> note 9. This question was not briefed, but arose during the February 13, 2004 hearing on the pending motions.  Therefore, the preceding discussion should not be read to assert that the Town <u>could not</u>, through the Consent Decree, have bound the Building Inspector to waive Building Code provisions.  However, it does indicate how <u>unlikely</u> it is that the Town actually did so.

for "a Writ of Mandamus and/or an injunction directing the Town to grant the special permit <u>and all other permits and approvals necessary for tower construction to proceed.</u>" Complaint (Prior Action) ¶ 25 (emphasis added).[13]

That said, the Agreement for Judgment stipulates that "judgment may enter for the plaintiff on Count I . . . <u>in the form of the Order attached hereto</u>." Agreement for Judgment (Prior Action) (emphasis added). While the entry of judgment on Count I could, hypothetically, signify that Nextel was to receive all the relief it originally prayed for in Count I, the attached detailed Order (i.e., the Consent Decree) clearly indicates that the relief actually awarded by the court was limited to the express terms of the Consent Decree, which only identified a zoning special permit as relief.

Nextel has submitted no evidence demonstrating that the parties intended the Consent Decree to affect any aspect of the permitting process other than the special permit to which it was expressly directed. Indeed, the very fact that Nextel believed it was obligated to apply for a building permit in February 2003 demonstrates that it did not believe that the Consent Decree ordered the Town to issue a building permit, or waived any

_____

[13]Similar language appears in the requests for relief in Counts II and IV (which Nextel agreed to dismiss with prejudice) and in the final prayer for relief at the end of the complaint. <u>See</u> <u>id.</u> ¶¶ 25, 35, D.

requirements of the Building Code.[14]

I find that the Consent Decree only required the Town to issue the special permit with conditions as specified, and that even if it includes further matters reasonably envisioned by the parties as essential to the agreement, those matters do not include a waiver of any portion of the Building Code.

b.    Merits of the Building Code Dispute

Having determined that the state Building Code was not preempted, either by my prior finding of a TCA violation or by the specific provisions of the Consent Decree, it might appear that I should now turn, for purposes of the prior action, to the merits of the Building Code dispute.  However, at this stage of the litigation, the Building Inspector's decision has been entirely superseded by the State Board's decision on review.[15] The State Board decided that Nextel's proposed WCF is governed by Mass. Regs. Code tit. 780, § 3109 in general, which applies to

---

[14]Furthermore, the plans themselves -- which were expressly incorporated into the Consent Decree, see Consent Decree ¶ 2 -- require Nextel to comply with at least some provisions of the Building Code.  The "Supplemental Notes" inscribed upon the plans state that "[a]ll materials as well as methods and processes used in the performance of the work shall conform to the standards of the Massachusetts State Building Code and the general contractor shall become familiar with such requirements.").

[15]Under the Building Code, all proceedings below are stayed immediately upon the appellant's entry of appeal.  Mass. Gen. Laws ch. 143, § 100.  Once the State Board issues its decision, the parties "shall take action forthwith to comply with the decision unless a later time is specified in the decision." Mass. Regs. Code tit. 780, § 122.5.

"radio and television antennas," and the last sentence of §
3109.1 in particular, which requires setback equal to the
antennal structure's height.  Whether this decision was supported
by substantial evidence is properly addressed within the Building
Code action, not the prior action.

The Town, meanwhile, is now bound to obey the State Board's
authoritative ruling that § 3109.1 applies to Nextel's WCF.[16]  To
order the Town to issue the building permit without the setback
required by § 3109.1 would be to order the Town to defy
Massachusetts law.

Because the Consent Decree did not bar the Town from
applying the Building Code, and since the State Board has now
bound the Town to apply § 3109.1 to Nextel's WCF, the Town is no
longer a party against whom relief could be granted in the prior
action.  Therefore, I will DENY the motion to enforce the Consent
Decree in the prior action.

---

[16]See Mass. Gen. Laws ch. 22, § 4A ("The commissioner may
review . . . action or refusal or failure of action by any local
inspector the result of which does not comply with the uniform
implementation of the state building code; and may reverse,
modify, or annul, in whole or in part, such action . . .
provided, however, that no order or action of the commissioner
shall reverse, modify, annul, or contravene any order, action,
determination, interpretation or any decision by the state board
of building regulations and standards or the state building code
appeals board."); id. ch. 143, § 59 (granting state courts
jurisdiction over actions to enforce Building Code); id. § 94(a)
(criminal penalties for violations); Mass. Regs. Code tit. 780, §
122.5 (once the State Board issues its decision, the parties
"shall take action forthwith to comply with the decision unless a
later time is specified in the decision.").

C.   **Motion for Contempt**

A motion for contempt will be granted "only if the complainant can offer clear and convincing evidence that a lucid and unambiguous order has been violated." <u>Porrata</u>, 958 F.2d at 7.   Since I have found that the Town did not violate the Consent Decree, <u>a fortiori</u> it cannot be held in contempt.   Therefore, I will DENY Nextel's motion to hold the Town in contempt in the prior action.

### III. THE BUILDING CODE ACTION

A.   **Motion to Intervene**

In my analysis of the DeFrancescos' motion to intervene in the prior action, I found that (1) they had an interest relating to the property that is the subject of the prior action, (2) the action could impair their ability to protect their interest, and (3) they might not be adequately represented by existing parties, but nevertheless denied their motion because it was untimely. <u>See</u> <u>supra</u> at 13.   For purposes of their motion to intervene in the Building Code action, I incorporate the first three findings <u>mutatis mutandis</u>.

As set forth below, I find that the motion to intervene in the Building Code action <u>was</u> timely.   Again, the factors for a timeliness determination under Rule 24 are:

> [1] the length of time the would-be intervenor knew or
> reasonably should have known that its interest was
> imperilled before it moved to intervene; [2] the
> foreseeable prejudice to the existing parties if
> intervention is granted; [3] the prejudice to the

would-be intervenor if intervention is denied; and [4] exceptional circumstances which may militate against or in favor of allowing late intervention.

Navieros Inter-Americanos, 120 F.3d at 321-22.  Because I find no exceptional circumstances, I address only the first three factors.

1.  Intervenors' delay

The DeFrancescos first moved to intervene on April 21, 2003, one day after Nextel filed its original motion to enforce the Consent Decree putting in issue for the first time the applicability of the Building Code.  After the State Board's decision was rendered, Nextel filed a new complaint on December 19, 2003, and the DeFrancescos moved to intervene in the Building Code action on January 20, 2004.  Irrespective of whether the DeFrancescos' failure to intervene in the prior action before the Building Code issue was raised may be viewed as a default of timeliness obligations, I find that the DeFrancescos' effort to participate in the Building Code dispute was not excessively delayed because it was commenced "when the intervenor became aware that its interest in the case would no longer be adequately protected by the parties."  See Pub. Citizen, 858 F.2d at 785.

2.  Prejudice to existing parties

I find little prejudice to Nextel, Hanson, or the State Board from the DeFrancescos' entry into this case.  Both Nextel and the Town have long been aware of the DeFrancescos' interest in, and positions regarding, the zoning and Building Code

-37-

disputes, and the State Board's ability to defend its interpretation of the Building Code is not likely to be threatened by the DeFrancescos' entry. While the DeFrancescos' goals and arguments differ from the other defendants', none of the DeFrancescos' arguments unfairly surprise or prejudice any existing party.

      3.   <u>Prejudice to intervenors</u>

The third timeliness factor (the prejudice intervenors are likely to face if the motion is denied) dovetails with the requirement under Fed. R. Civ. P. 24(a)(2) that the proposed intervenor's interests not be represented adequately by an existing party. <u>See</u> <u>United Nuclear</u>, 696 F.2d 143; <u>see also</u> <u>Daggett</u>, 172 F.3d at 113 (noting interplay between factors establishing intervention as of right). That is, if the intervenors' interests are adequately represented by the existing parties, it is difficult to see how they could be substantially prejudiced by not being allowed to intervene. Conversely, if their interests are <u>not</u> adequately represented, they will generally be prejudiced if intervention is denied. As stated above, the DeFrancescos' interests could be prejudiced by defendants' entering into a second settlement that permitted the tower to be built according its current (or a substantially similar) design. The DeFrancescos' presence in the Building Code action can force a decision on the merits, and prevent the existing defendants from entering into a compromise that

adversely affects their unique local interests.

3.   Disposition

The case for Rule 24(a) intervention in the Building Code action is close.  The DeFrancescos present little or no additional legal argument beyond what the State Board and Town offer, and they share the same ultimate goal as the Town of preventing construction of the tower.  However, there is a potential for divergence of interests because the governmental defendants might settle this litigation in exchange for concessions that would not alleviate the DeFrancescos' concerns. I find that the DeFrancescos meet the requirements for Rule 24(a) intervention as of right,[17] and I will GRANT their motion to intervene in the Building Code action.

**B.   Motion for Summary Judgment**

1.   Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists.  Nat'l

---

[17]It bears noting that even if the DeFrancescos did not meet the requirements for Rule 24(a) intervention, I would exercise my discretion to allow them to intervene under Rule 24(b), on the basis of the same findings made above.

Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.
1995), cert. denied, 515 U.S. 1103 (1995).  Once the movant has
made such a showing, the nonmovant must point to specific facts
demonstrating that there is, indeed, a trialworthy issue.  Id.

A fact is "material" if it has the "potential to affect the
outcome of the suit under the applicable law."  Santiago-Ramos v.
Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000),
and a "genuine" issue is one supported by such evidence that "a
'reasonable jury, drawing favorable inferences,' could resolve it
in favor of the nonmoving party."  Triangle Trading Co., Inc. v.
Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith
v. F.W. Morse & Co., Inc., 76 F.3d 413, 427 (1st Cir. 1996)).

2.  Sovereign immunity

The State Board argues that Nextel's claims against it are
barred by the Eleventh Amendment to the United States
Constitution.[18]  That amendment has been interpreted to bar
federal suits by private citizens against states on the theory
that the states hold a residual sovereign immunity.  Furthermore,
states are immune from private suit even where relief beyond
declaratory judgment is not sought against the state, because
"distinct from financial concerns, the state 'also has a
"dignity" interest as a sovereign in not being haled into federal

---

[18]"The Judicial power of the United States shall not be
construed to extend to any suit in law or equity, commenced or
prosecuted against one of the United States by Citizens of
another State, or by Citizens or Subjects of any Foreign State."

court.'"  Redondo Constr. Corp. v. P.R. Highway & Transp. Auth.,
357 F.3d 124, 126-27 (1st Cir. 2004) (quoting Fresenius Med. Care
Cardiovascular Resources, Inc. v. P.R. & Caribbean Cardiovascular
Ctr. Corp., 322 F.3d 56, 63 (1st Cir. 2003).[19]

     Here there is a substantial question of whether the
Commonwealth's sovereign immunity bars Nextel's claims against
the State Board.  Two requirements in sovereign immunity
jurisprudence are particularly relevant here.  "Congress may
abrogate the States' Eleventh Amendment immunity when it both [1]
unequivocally intends to do so and [2] 'act[s] pursuant to a
valid grant of constitutional authority.'"  Bd. of Trustees v.
Garrett, 531 U.S. 356, 363 (2001) (quoting Kimel v. Fla. Bd. of
Regents, 528 U.S. 62, 73 (2000)) (alteration in original).  The
first requirement (clear intent to abrogate) is satisfied: the
TCA authorizes "[a]ny person adversely affected by any final
action or failure to act by a State . . . government or any
instrumentality thereof that is inconsistent with this
subparagraph . . . [to] commence an action in any court of
competent jurisdiction."  47 U.S.C. § 332(c)(7)(B)(v).[20]

_____

     [19]While technically the State Board, not the Commonwealth,
is the defendant, there is no dispute that the State Board enjoys
the protection of the Commonwealth's sovereign immunity.  See
generally Fresenius, 322 F.3d at 64-65.

     [20]This court is a "court of competent jurisdiction" for the
purposes of this case.  Though no court has construed that phrase
in the TCA, in general it simply means a "court that has the
power and authority to do a particular act; one recognized by law
as possessing the right to adjudicate a controversy."  Black's
Law Dictionary (7th ed. 1999).  This court has subject matter

The question, then, is whether the second requirement -- that Congress had the constitutional authority to abrogate sovereign immunity in the TCA – is met.  Congress enacted the TCA pursuant to the Commerce Clause of Article I.[21]  See 47 U.S.C. § 151.  But it appears that Congress has no authority to abrogate sovereign immunity under the Commerce Clause because "Congress may not . . . base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I." Garrett, 531 U.S. at 364; Kimel, 528 U.S. at 79.  In the words of the Third Circuit, "[t]he Telecommunications Act of 1996 was clearly a congressional exercise of its Commerce Clause power. Congress did not, and could not, abrogate Eleventh Amendment immunity in providing for federal court review in [the TCA]." MCI Telecomm. Corp. v. Bell Atl. Pa., 271 F.3d 491, 503 (3d Cir. 2001); accord MCI Telecomm. Corp. v. Ill. Bell Tel. Co., 222 F.3d 323, 338 (7th Cir. 2000) ("Unquestionably, Congress could not have abrogated state sovereign immunity with the 1996

_____

jurisdiction under 28 U.S.C. § 1331 (federal question), and personal jurisdiction over the defendants by virtue of proper in-state service under Fed. R. Civ. P. 4(e).  See generally United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085-86 (1st Cir. 1992) (explaining statutory and constitutional limits on federal courts' personal jurisdiction in federal question cases).  Therefore, I find that it is a court of competent jurisdiction for the Building Code dispute.

[21]"The Congress shall have Power . . . To regulate commerce with foreign nations, and among the several States, and with the Indian tribes."  U.S. Const. art. I, § 8, cl. 3.

Telecommunications Act."), <u>cert. denied</u>, 531 U.S. 1132 (2001).[22]

An arguably applicable exception is the venerable doctrine of <u>Ex parte Young</u>, 209 U.S. 123 (1908), under which there is no sovereign immunity bar to a suit against state <u>officers</u> in their official capacities.  The theory (or perhaps fiction) undergirding the doctrine is that state officers have no authority to violate the Constitution or laws of the United States, and if they do so, they do it without state authority, and therefore without state sovereign immunity.  <u>See id.</u> at 159-60.  Recently, the Supreme Court held that an <u>Ex parte Young</u> action may in fact be brought against state commissioners under a different provision of the TCA.  <u>See</u> <u>Verizon Md. Inc. v. Pub. Serv. Comm'n</u>, 535 U.S. 635, 645-46 (2002).

The threshold problem with reliance on <u>Ex parte Young</u> here is that Nextel did <u>not</u> sue the members of the State Board in their official capacities; Board members are not named defendants at all.  A plaintiff cannot claim the benefits of the <u>Ex parte Young</u> exception -- which enables it to sue state officers in their official capacities, and thus avoid directly suing the state or a state agency -- without actually suing the state officers.  <u>See</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 276 (1986) (<u>Ex</u>

---

[22]Even if Congress could abrogate state sovereign immunity in the TCA, Count II of Nextel's complaint, which alleges violations of <u>state</u> law, would still be barred.  It is well settled that "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment."  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 117 (1984).

parte Young potentially applies "[w]here the State itself or one
of its agencies or departments is not named as defendant and
where a state official is named instead") (emphasis added);
Westside Mothers v. Haveman, 289 F.3d 852, 860 (6th Cir. 2002)
("Under . . . Ex parte Young and its progeny, a suit that claims
that a state official's actions violate the constitution or
federal law is not . . . barred by sovereign immunity, so long as
the state official is the named defendant") (emphasis added);
Thompson v. Colorado, 278 F.3d 1020, 1024-25 (10th Cir. 2001)
("Because no state official has been named as a defendant in this
suit, however, the Ex parte Young exception to Eleventh Amendment
immunity is not appropriate."); Abick v. Michigan, 803 F.2d 874,
877 (6th Cir. 1986) ("[O]nly the entity of the State Judicial
Council was named as a defendant.  No particular individual's
conduct is challenged . . . so the exception cannot apply.").

     Whether the plaintiff names the state officers as defendants
can be outcome-determinative.  Compare Mills v. Maine, 118 F.3d
37 (1st Cir. 1997) (denying attempt of plaintiffs, who originally
named state as sole defendant, to amend complaint to add
individual officer as new party in attempt to come within Ex
parte Young doctrine) with Amisub (PSL), Inc. v. Colo. Dep't of
Social Servs., 879 F.2d 789, 793 (10th Cir. 1989) (dismissing
claim against state agency under Eleventh Amendment, but reaching
merits because complaint had also named executive director as
defendant).  In Verizon Maryland, which Nextel relies on, the

plaintiff originally "nam[ed] as defendants the Commission, [and]
its individual members in their official capacities."  535 U.S.
at 640 (emphasis added).

Thus, it appears that the State Board has, at the very
least, raised a substantial question regarding sovereign
immunity.[23]  However, I need not decide this question because, as
explained below, I find that the State Board's decision was
supported by substantial evidence.[24]

3.    The Building Code Dispute

---

[23]I further note that Nextel has not argued that the
Commonwealth has waived its sovereign immunity in federal court,
and I find no waiver.  See generally Rivera v. Massachusetts, 16
F. Supp. 2d 84, 87-88 & n.4 (D. Mass. 1998) (in the context of
Massachusetts Tort Claims Act, concluding that Massachusetts did
not waive sovereign immunity in federal court).

[24]Because I find for the State Board on the merits, I am not
required to decide, and to some extent am discouraged from
deciding, the sovereign immunity question.  In Parella v.
Retirement Bd. of the R.I. Employees' Retirement System, 173 F.3d
46, 53-57 (1st Cir. 1999), the First Circuit held that a federal
court is not obliged to address an Eleventh Amendment defense
before reaching the merits.  It held that "Eleventh Amendment
questions are excluded from the category of Article III issues
that must be addressed before the merits," id. at 55, and
explained instead that "the relevant maxim in the Eleventh
Amendment context is not that federal courts cannot act without
first establishing their jurisdiction, but rather that courts
should 'not reach constitutional questions in advance of the
necessity of deciding them,'" id. at 56 (quoting Am. Mfrs. Mut.
Ins. Co. v. Sullivan, 526 U.S. 40, 62 (Ginsburg, J., concurring
in part and concurring in the judgment)).
    The Parella court did not expressly rule that courts must
avoid the Eleventh Amendment issue if possible, only that they
may do so.  However, since Parella the First Circuit has advised
that it "recommend[s] this course to the district courts of this
circuit as the wiser approach."  Greenless v. Almond, 277 F.3d
601, 607-08 (1st Cir. 2002).

a.    The Substantial Evidence Standard

The decision of a state or local government "to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332 (c)(7)(b)(iii).  This standard is identical to the "substantial evidence" standard applied to a review of an administrative agency's findings of fact.  Southwestern Bell Mobile Sys. v. Todd, 244 F.3d 51, 58 (1st Cir. 2001).  The decision must be supported by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id. (quoting Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 718 (1st Cir. 1999)).  Under this standard, "the courts defer to the decision of the local authority, provided that the local board picks between reasonable inferences from the record before it."  Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 23 (1st Cir. 2002).  The actual amount of supporting evidence required is low; the state or local body's decision need only be "'supported by . . . more than a scintilla of evidence.'"  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (quoting Cellular Tel. Co. v. Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999)).  However, the court "normally considers only evidence contained in the administrative record (i.e., the evidence presented to the [state or local body making the decision])."  Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 628 (1st Cir. 2002).

The only relevant evidence, as opposed to legal characterization of that evidence, is whether the planned Nextel facility is a roof-mounted structure. The parties agree that it is. I turn then to the core dispute, that of characterizing the structure for purposes of the Building Code.

      b. <u>Analysis</u>

The State Board argues that Nextel's proposed WCF is governed by Mass. Regs. Code tit. 780, § 3109, which applies to "radio and television antennas," while Nextel argues that it is governed only by § 3108, which applies to "radio and television towers." Furthermore, Nextel argues that even if the WCF is governed by § 3109, it is not governed by § 3109.1, the provision relied upon by the Building Inspector and the State Board, because that provision only applies to antennas for which permits are not required.

Section 3109.1, entitled "Permits not required," provides:

> A building permit is not required for roof installation
> of antennal structures not more than 12 feet (3658 mm)
> in height for private radio or television reception.
> Such a structure shall not be erected so as to injure
> the roof covering, and when removed from the roof, the
> roof covering shall be repaired to maintain weather and
> water tightness. The installation of any antennal
> structure mounted on the roof of a building shall not
> be erected nearer to the lot line than the total height
> of the antennal structure above the roof, nor shall
> such structure be erected near electric power lines or
> encroach upon any street or other public space.

The parties disagree about whether this provision applies to Nextel's proposed facility; defendants contend that the setback and power-line avoidance requirements of § 3109.1 apply, whereas

Nextel argues that only § 3108 (applying to towers) applies to its proposal.[25]  The regulations are somewhat complex, and the parties focus on the text, logic, and legislative commentary surrounding each of them.

Defendants contend that the last sentence of § 3109.1 is clear and unambiguous.  Again, it states:

> The installation of <u>any</u> antennal structure mounted on the roof of a building shall not be erected nearer to the lot line than the total height of the antennal structure above the roof, nor shall such structure be erected near electric power lines or encroach upon any street or other public space.

<u>Id.</u> § 3109.1 (emphasis added).  Since the regulation uses the broad phrase "antennal structure" -- designed to cover more types of facilities than the narrower "antenna" -- and since Nextel's proposed WCF will indisputably be mounted on the roof of a building, defendants explain, the setback and power-line avoidance requirements apply.

Nextel counters that this sentence cannot be interpreted out of the context of the entire paragraph.  Section 3109.1 is entitled "Permits not required" -- a condition that simply does not apply to Nextel's proposed WCF.[26]  Moreover, the very first

---

[25]At an earlier stage of this litigation, Nextel argued that the facility would be covered by § 3109.2, entitled "Permits required," which appears to apply to "roof-mounted antennal structures more than 12 feet (3658 mm) in height."  Nextel now argues that all of § 3109 is irrelevant because the structure is a "tower," not an "antenna."

[26]The fact that § 3109.1's caption does not apply to Nextel's proposed WCF has some interpretive value, but is hardly

-48-

sentence of § 3109.1 states that "a building permit is not
required for roof installation of antennal structures not more
than 12 feet . . . in height," another condition which plainly
does not apply to Nextel's 130 foot tower.  Thus, Nextel
contends, since the scope of § 3109.1 is limited, the reference
to "any antennal structure" in the last sentence can only refer
to those antennas to which § 3109.1 applies: antennas not more

--------------------------------------------------

the trump card that Nextel portrays.  Headings of individual
statutory or regulatory provisions, like the titles of statutes,
are "'tools available for the resolution of a doubt' about the
meaning of a statute." Almendarez-Torres v. United States, 523
U.S. 224, 234 (1998) (quoting Bhd. of R.R. Trainmen v. Baltimore
& Ohio R.R. Co., 331 U.S. 519, 528-529 (1947)).  However, their
role is limited:

> [H]eadings and titles are not meant to take the place
> of the detailed provisions of the text.  Nor are they
> necessarily designed to be a reference guide or a
> synopsis.  Where the text is complicated and prolific,
> headings and titles can do no more than indicate the
> provisions in a most general manner; to attempt to
> refer to each specific provision would often be
> ungainly as well as useless.  As a result, matters in
> the text which deviate from those falling within the
> general pattern are frequently unreflected in the
> headings and titles.  Factors of this type have led to
> the wise rule that the title of a statute and the
> heading of a section cannot limit the plain meaning of
> the text.

Bhd. of R.R. Trainmen, 331 U.S. at 528-29; accord Whitman v. Am.
Trucking Ass'ns, 531 U.S. 457, 483 (2001) (interpretive role of
title of act is limited to "shed[ding] light on some ambiguous
word or phrase in the statute itself" (internal quotation marks
omitted)); Kaplan v. Contributory Ret. Appeal Bd., 51 Mass. App.
Ct. 201, 204-05 & n.6 (2001) ("[M]uch as the title of an act
cannot limit its operation to a field more narrow than that
established by the act itself, the various headings cited cannot
control the specifics of the statutory provisions, although they
may shed light on ambiguous language.").

than twelve feet high and for which no permit is required.

These arguments are superficially appealing, but defendants have two powerful and pointed arrows in their quiver.  First, defendants argue, the drafters of § 3109.1 knew perfectly well how to limit the application of a sentence to a structure described in a preceding sentence: the middle sentence of § 3109.1 applies to "[s]uch a structure," whereas the last sentence applies to "any" roof-mounted antennal structure.  Second, the authoritative BOCA Commentary to § 3109.1 throws Nextel's interpretation into doubt.[27]  It is divided into two distinct paragraphs.  The first paragraph simply explains why roof-mounted antennas that are twelve feet or shorter do not require permits.  The second paragraph explains:

> To prevent damage to adjacent structures should the
> antenna collapse, antennas are not to be erected closer
> to the lot line than the height of the antenna.
> Therefore, <u>if the antenna is 20 feet in height, the
> location of the antenna must be at least 20 feet from
> the nearest lot line.</u>  Adequate clearance is to be
> maintained between the antenna and the adjacent power
> lines . . . .

BOCA Commentary to § 3109.1, at 31-27 (emphasis added).  If the setback requirement were only to apply to roof-mounted antennas less than twelve feet in height, it is hard to understand why the

---

[27]The Massachusetts Building Code, Mass. Regs. Code tit. 780, is "based on the 1993 edition of the Building Officials and Code Administrators (BOCA) National Building Code." Mass. Regs. Code tit. 780, Foreword and Acknowledgments.  In fact, the sections at issue here were adopted from the BOCA National Building Code without a single change.  Thus, the BOCA Commentary reflects the understanding of the drafters.

one and only example that the code drafters gave to illustrate the requirement involved a twenty-foot antenna.

Nextel responds that it is irrelevant that (or why) the Building Code drafters included a contradictory example in the commentary to § 3109.1, because the proposed WCF is a "tower" falling under § 3108.  The BOCA Commentary expressly states that a tower "is exempt from other provisions of the code" other than certain exceptions not relevant here, and that the "minimum construction criteria" and "structural integrity of the tower" are governed by provisions of § 3108.  BOCA Commentary to § 3108, at 31-26.  On the other hand, the last sentence of § 3109.2 (governing antennas) states that "design and materials of construction shall comply with the requirements of 780 MASS. REGS. CODE TIT. 3108.3 [governing towers] for character, quality and minimum dimension."  Mass. Regs. Code tit. 780, § 3109.2. This could simply mean that § 3109.2 incorporates by reference the unrelated requirements of § 3108.3, or it could mean that the Code contemplates that some structures may be both "antennal structures" and "towers."

Thus, viewing the Building Code with a fresh pair of eyes, it is clear that this case presents, at the very least, a difficult question of regulatory construction.  In fact, I find the regulations to be ambiguous as to the issue presented.  The question before me, however, is not what the Building Code means, but rather whether the State Board's decision was supported by

substantial evidence.  I must uphold the State Board's interpretation if it "pick[ed] between reasonable inferences from the record before it."  Nat'l Tower, 297 F.3d at 23.

Before deciding this question, I must emphasize an inherent difficulty in applying the substantial evidence standard to a decision of this nature.  The substantial evidence test originated in the review of an administrative agency's findings of fact.  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951).  Here, the dispute is not really about findings of fact, but rather about whether a certain sentence in a complex regulatory code applies to a particular structure, centering mainly on the definitions of various terms and the interrelations between various provisions.  Therefore, I am not reviewing so much for the substantiality of any "evidence" -- the only evidence involved is the plans for the structure -- but rather for the reasonableness of the regulatory interpretation.  My review will therefore tend more towards the nature of a review of an administrative agency's construction of an ambiguous statute according to principles of deference.  See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984); accord Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 618 (1997) (similar standard).

On this standard, I find that the State Board's decision was supported by substantial evidence.  The interrelationship between § 3108 and § 3109 is unclear, as is the scope of the last

sentence of § 3109.1.  Despite the widespread use of the BOCA
Building Code, I have found no court decision in any jurisdiction
that interprets either section.  Against the background of this
ambiguity, and after consulting the BOCA Commentary, a
dictionary, and the plans for the WCF, the State Board concluded
that, whether or not the WCF was a "tower," it was certainly a
"roof-mounted antennal structure."   The State Board concluded
that the WCF was subject to § 3109 in general, and the last
sentence of § 3109.1 in particular.[28]

While Nextel presents some colorable arguments that this
interpretation was wrong, my review is limited to determining
whether the State Board's decision was "'supported by . . . more
than a scintilla of evidence.'"   ATC Realty, 303 F.3d at 94.  As
a formal matter, if I am required to point to the supporting
evidence, the scintilla (or more) that supports the decision are
the undisputed facts that the WCF will be roof-mounted and that

---

[28]Nextel's principal argument to the State Board was that §
3109 should not apply at all, and only § 3108 should apply.
Since the question of whether § 3109.1 or § 3109.2 (or both)
would apply was not presented to the Board, the record of the
Board's deliberation contains considerably less discussion of
that question.  That said, the Chairman of the Board noted that
"the code text clearly requires antennal structures that are
mounted on a roof to be located no closer to the lot line than
the total height of the antennal structure," and the Board's
final conclusion was that the Building Inspector "had correctly
applied the provisions of 780 MASS. REGS. CODE TIT. Section
3109."  Therefore, I read the State Board's decision as covering
both the questions (1) whether any portion of § 3109 should apply
to the WCF and (2) whether § 3109.1 should apply to the WCF, and
answering affirmatively to both.

its height is greater than its distance to the lot line.  As a practical matter, given the regulatory ambiguity, and given the written record of the State Board's reasoned debate on the regulatory construction questions at issue here, I find that the State Board "pick[ed] between reasonable inferences" from the record before it.  <u>Nat'l Tower</u>, 297 F.3d at 23.

In sum, I conclude that the Board's decision was supported by substantial evidence.  Accordingly, I will DENY Nextel's motion for summary judgment as to the merits on Counts I (violation of 47 U.S.C. § 332 (c)(7)(B)(iii)) and II (arbitrary and capricious decision under state law).

4.    <u>Remaining Matters</u>

I incorporate into the Building Code action my finding in the prior action that the Building Code was not preempted, by either the TCA or the Consent Decree.  Furthermore, I also DENY Nextel's motion for summary judgment against the Town because the Town is not a real party in interest, and no relief can be awarded against it except concomitantly with relief against the State Board, which I have denied.

Finally, since there are no genuine disputes of material fact and all of Nextel's arguments fail either jurisdictionally or on the merits, I find that defendants are themselves entitled to summary judgment.  Although defendants have not so moved, I may grant summary judgment in their favor <u>sua sponte</u> because Nextel has had notice and sufficient opportunity to present its

arguments and any material evidence in its favor.  See, e.g.,
Diaz v. City of Fitchburg, 176 F.3d 560, 562 n.2 (1st Cir. 1999);
Bank v. IBM, 145 F.3d 420, 431 (1st Cir. 1998).

### IV. CONCLUSION

For the reasons set forth above, I rule as follows:

1.    In the prior action, the DeFrancescos' motion to
      intervene is DENIED.

2.    In the prior action, Nextel's motions to enforce the
      consent decree and for contempt are DENIED.

3.    In the Building Code action, the DeFrancescos' motion
      to intervene is GRANTED.

4.    In the Building Code action, Nextel's motion for

summary judgment is DENIED.

5.    In the Building Code action, summary judgment is

GRANTED in favor of all defendants.

/s/ Douglas P. Woodlock

_____

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE